The final case on our call today, this morning, is Agenda No. 6, Ruben D. Walker v. Andrea Lynn Chasteen, etc. In this matter, I am told that the appellants will be splitting their 20-minute time, 10 minutes each. Then, of course, the appellee will have the full 20 minutes, and for rebuttal, again, the appellants will be splitting their time 5 minutes each. I believe that's correct, and if so, counsels, for the appellant, you may proceed. Chief Justice, fellow justices, counsel, may it please the court. My name is Scott Piles. I represent the 102 circuit court clerks in the state of Illinois who have been sued for a $102 million class action case regarding fees that were collected by the clerks pursuant to a duly enacted statute prior to its finding of unconstitutionality by this court. In this matter, the issue is, in the defendant's view, relatively simple. Does a state official who is performing their duty pursuant to statute lose their sovereign immunity for simply following a statute prior to its finding of unconstitutionality? The appellate court, in this case, answered that question, yes. The appellate court found that in this matter, because the fee had been found unconstitutional, that the finding and the collecting of that fee by the state circuit clerks violated their constitutional, outside of their constitutional duty, and therefore were stripped of their sovereign immunity. The defendants in this case feel that the appellate court was wrong for three reasons. Number one, appellate court's ruling expanded the prospective relief exception for sovereign immunity. Essentially, as found in the case of Parmar v. Madigan, the state of Illinois, under the State Immunity Act, shall not be made a defendant or a party in any court. In Parmar, it was recognized there's an exception to sovereign immunity, and that is in the form of prospective relief. Now, this exception is also referred to as the officer's suit exception. Now, in this particular case, there was a fee under the Mortgage Foreclosure Act that was collected as an add-on, a $50 fee. The clerks, as part of their duties, and as part of their statutory duties to collect these filing fees, took in this $50 fee for a period of almost 10 years. Plaintiffs in this case filed a lawsuit claiming that the fee was unconstitutional, which this court confirmed, giving prospective relief to the plaintiffs in this case by not allowing the fee to be no longer collected. This court remanded it back to the circuit court, and then there was a lifting of the stay of the injunction that had been entered in the trial court to refrain from collecting the fee. And then there was discovery conducted to how much of the fee had been paid. It's the defendant's position in this case that when this court issued its ruling in 2021, that the plaintiffs won. And counsel, currently the plaintiffs are not seeking prospective relief. Is that your position? That's correct, because the prospective relief has already been given in Walker, what I'll refer to as Walker 2, because this case has been up three times and this is the third time. In Walker 2, the court gave the plaintiffs their prospective relief, stopping the collection of this $50 fee, and there were some other tiered fees that were also. The collection of those was stopped, so the plaintiffs got their prospective relief in that case. And here they're seeking to basically get the money that was previously taken and previously sent already to the state. That's correct. And it's our position that that is not allowed under sovereign immunity because the request for a past money judgment is not fit within the officer's suit exception for sovereign immunity. Now, that's not to say that the plaintiffs do not have an avenue to collect these fees. That avenue, however, is in the Illinois Court of Claims Act. Counsel, is it fair to ask the plaintiffs to take this to the Court of Claims after this litigation has gone on for a decade? Justice Cunningham, I would say that this case has had a very tortured history in the courts. It went up on an issue for three years about whether or not the clerks were fee officers. This then went back down to the trial court after that decision, and then there was hearings and briefing on the constitutionality. The fact of the matter is that we are here today, and I would say this. With regard to where the case should go, this is not necessarily an issue about fairness. It is an issue about jurisdiction. Which forum can the plaintiffs recover their mortgage foreclosure fees that were unconstitutionally charged for the ten years prior to the finding of this court? Okay, I have a follow-up question. The amount of the percentage of the fee that was withheld under the statute was 2%, right? Something like that? The clerks retained a 2% of the fees that were collected for administrative costs. Okay, and that was segregated in a separate account for a county account. So it sounds to me like the 2% of the money that was collected was segregated so that it would be, I wouldn't say easy, but it would be possible to isolate that money if there was some order that restitution should be made. Justice Cunningham, to my knowledge, the 2% was not retained. The 2% of the fee was kept by the clerk to cover their administrative costs in collecting the fee. I understand, but it was kept in a separate account from their, according to the record, from the other monies that the clerks used for whatever their administrative purposes were. In the record, there is reference that the Will County clerk kept some of the money instead of sending to the state treasurer during the pendency of this litigation. That was raised in the Sir Rebuttal Brief. There was no court-ordered fund for that. It was not, I don't want to say the word segregated, it's just that the Will County clerk kept a portion of the money that they'd collected in a $50 fee and did not send it to the state. This is to be differentiated between having something in the protest money fund, which is deposited with the court, there is a trustee appointed, and then it is when the litigation is resolved, like it had been in 2021, if this had been in a protest money fund, the court would have then ordered the trustee that had been appointed by the court to pay the money to the plaintiffs. Those procedures were not followed here. So, counsel, really the question becomes, how much money, if any, is still available that has been segregated or put in a separate account that has not been utilized by the clerks? Is there any, and if so, how much? Justice Holder-White, my understanding of the record, there's an indication at some point that the Will County clerk had, I believe, something around $676,000 of the $102 million that had been collected. After the case was dismissed, I'm assuming that that money's probably been sent to the state so that it can be used for the court of claims. In the trial court, there was a suggestion that the plaintiffs could get the money through the court of claims and that the money would then be available to claims that had been perfected through that. There may have been some more money by another county, but I can't speak to that. That's the Cook County clerk that was involved in the lower courts. I think there may have been some money there. But we're talking about a very small fraction of the money. And frankly, the defendants would have a hard time wondering what mechanism we would do that with. If the court here were to return this to the trial court, we're essentially sending a signal that we can go ahead and sue the state and recover money for a past wrong. And that's exactly what sovereign immunity prevents. Is there any potential issue of statute of limitations in the court of claims for the bringing of this suit? Justice Wilford, in my experience, and I don't know what the plaintiffs in this case did, when I was in private practice before joining the Will County State's Attorney's Office, if there was a claim that was potentially involved with the state, I filed two claims. I filed one in the court of claims. I filed one in the circuit court. In case the circuit court case went south or got dismissed, I would have the court of claims case. The court of claims is certainly willing to hold a claim in abeyance while the penancy of a circuit court case is handled. I don't know if that was done here. But could there be potential? Sure, there could be. There could be a potential. Thank you. I'm sorry, Justice O'Brien. Thank you. My question is, you know, you cannot bring an action against the state for damages, but isn't this just a claim for a refund, for restitution, to get money back that was unlawfully taken? Justice O'Brien, typically my understanding of how that works is if the fees were brought in and they were just restitution, the money would still be there, and it would be set aside already. And then when a decision came down, then the money could just be returned. That's not the case here. All the money that's been collected by the state circuit clerks had been sent to the state treasurer for funding of the program under the statute that was found in the Constitution. The money spent, the $102 million, is going to have to come from the state budget. And is that also your contention regarding the 2% that the clerks kept? Is that they used it for their operating expenses? Correct. Under the statute, the clerks were allowed to keep 2% of the $50, maybe $2.50. Those fees were kept to the clerk as kind of a reimbursement for them, for the work that they have to do sending the money down to the state, state treasurer, and there were funds that have to be followed, a process that was involved. Counsel, your light is on. We will continue to discuss these issues, but I'd like to hear next from your co-counsel. Counsel, can I ask you, to begin with, to respond to the athlete's arguments concerning the Althon case. We've been talking about sovereign immunity. We've been talking about prospective relief rather than damages. Your opponent here, the athlete, relies heavily on that case. Can you explain your position as to that case? Yes, Your Honor, and for the record, my name is Alexandra Shrove, assistant attorney general on behalf of defendants' appellants, the 18 clerks. In response to your question, Your Honor, plaintiffs have suggested that sovereign immunity does not bar their refund request because the court's decision, as you mentioned in Alfine 1 and 2, supposedly allowed that same type of monetary relief. But those cases did no such thing. In both Alfine 1 and 2, this court explained that the plaintiff's action did not implicate sovereign immunity because of the specific injunctive relief that was sought in those cases, the withholding of future funds from being sent to the state. So, in other words, this court, excuse me, the circuit court could fashion injunctive relief, specifically use the term injunctive relief, to withhold future payments to the state until the state's overcompensation had been rectified. But it could not craft a direct, could not craft a relief that required a direct monetary payment to be sent from the state to rectify that overcompensation. Because, remember, that whether or not sovereign immunity applies depends specifically upon the relief sought. Therefore, rather than supporting plaintiff's position, both Alfine 1 and 2 squarely support the clerk's position and falls in line with this court's sovereign immunity precedent, sovereign immunity bars plaintiff's refund claim because it seeks a direct monetary payment from the state to remedy a past wrong. And that relief is fundamentally distinct from the injunctive relief that was ordered in Alfine 1 and 2. And, therefore, neither of those cases support plaintiff's position. But turning back to my first point, I'd like to focus on the Parmar case specifically. Because this court, in its Parmar v. Maligan decision, explicitly held that the officer's exception to the doctrine of sovereign immunity only allows a plaintiff to seek prospective injunctive relief to prohibit future unlawful conduct by a state officer. It does not allow a plaintiff to seek retrospective monetary relief to redress a past wrong. And that decision was consistent with this court's previous understanding of how the doctrine worked and how sovereign immunity applies. But plaintiffs here are seeking... are asking this court to deviate from that long-standing understanding of the doctrine. They are seeking a refund in the form of a direct monetary payment from the state for the amount paid under the litigation tax. They are no longer seeking prospective relief, as Your Honors noted. They've already received that specific relief from this court in its previous Walker decision. So the only remaining relief that plaintiffs seek here is a relief for a past wrong, a return of the fees that were already paid. And the appellate court therefore fundamentally misunderstood the Parmar decision when it held that the exception to sovereign immunity applies to damages, only to damages for a past wrong. Instead, Parmar expressly held that the exception to sovereign immunity only applies for claims seeking prospective injunctive relief. And this court's prior precedent... excuse me, that decision is consistent with this court's previous precedent and is consistent with the purpose of the exception to protect state coffers, and it's consistent with the analogous federal law under the Ex Parte Young exception to sovereign immunity under the federal 11th Amendment. Now, turning to my second point, as Your Honors noted, the plaintiffs here have attempted to circumvent sovereign immunity by framing their refund request as one for restitution rather than damages. But any distinction between the two types of relief is ultimately immaterial to whether or not sovereign immunity bars plaintiffs' refund claim because both are forms of retrospective relief. The relevant inquiry under Parmar is not whether plaintiffs sought restitution or whether they sought damages. Rather, the ultimate question is whether they sought prospective injunctive relief, attempting to prohibit future unlawful conduct, or whether or not they sought a retrospective monetary relief for a past wrong. And here, plaintiffs have sought a direct monetary payment to be drawn from the state treasury to remedy a past inequity. And so whether or not that relief is categorized as restitution or as damages is ultimately irrelevant because both provide retrospective relief. If we look to, for example, the restatement third of restitution, it classifies restitution as in order to restore a benefit that has been lost or to eliminate an unjust enrichment that has occurred. It also describes restitution as a reversal of a transfer, all of which emphasizes restitution's backward-looking nature as an act to reverse what has already happened. And both Illinois appellate courts and this court, as well as federal courts, have treated restitution in the same manner, as a means of retrospective relief to redress a party for a past inequity. So whether restitution is an act to restore someone to a previous position or to restore something to someone, all of the definitions and understandings of restitution presuppose a past event upon which a party must be compensated. Consequently, their characterization of their refund claim as restitution makes no ultimate difference in sovereign immunity analysis because both restitution and damages are predicated on a past wrong, a form of relief strictly prohibited by sovereign immunity. And here, the refund claim sought retrospective monetary relief, a return of the fees paid, a form of relief barred by sovereign immunity and not available under the officer-student exception. If there are no further questions, thank you. Thank you very much, counsel. Counsel to the appellee. May it please the court. My name is Daniel Cray. I'm here to provide arguments for the plaintiff, appellees. First, before I begin my structured remarks, I'd like to make one comment to one of the first arguments made by counsel for the appellants, and that is I think he used the term that his clients, the clerks, were not outside of their duties and therefore were allowed sovereign immunity. That's not why they were sued. They're not outside their duties. What they did was they applied an unconstitutional statute and violated the plaintiff's rights. That's why they don't get sovereign immunity. So accepting the defendant's claim that judicial review allows the courts to declare legislation unconstitutional but does not allow the courts to ensure that the violation is corrected renders the power of judicial review meaningless for Reuben Walker and the remaining plaintiffs. Counsel, I can't help but wonder what were the clerks supposed to do? They were told to withhold these funds and to send them. There had been no adjudication that this was unconstitutional. I mean, talk about being between a rock and a hard place. Well, Your Honor, no one is, because they're doing their duty, no one is going to submit them or indict them for a Class III felony as they claim. They can go on and do their duty. Nothing untoward happened to the clerks here from a criminal standpoint. They were free to do their duty, but there is consequence if they provide or if they apply, rather, an unconstitutional statute and violate my client's rights. We sue the clerks because they are the ones that had contact with our clients. They were the ones who applied the statute and took the money. This is a way to get judicial review of the statute is to sue the clerks. Mr. Cray, at this point you are seeking redress for a past wrong, the collection of those improperly opposed fees. But pursuant to Parmar, isn't that the province of the court of claims addressing a past wrong? Well, to answer your question, Justice Rochford, I believe that there is no sovereign immunity here. That's the argument, that there's no sovereign immunity. As far as restitution, it is considered in a number of Illinois courts, including Raintree Homes, it's not considered being done to obtain a past wrong. There's an unjust enrichment of the defendants, and that's why it's being done. It's different in kind than a tort case or something where you are obtaining substitute-type damages. It's not considered damages at all. It's merely obtaining what is rightfully yours. And, again, there's been a taking. Clearly there's been a taking by the state. So if we can discuss damages, refund, restitution, there are a lot of terms we're using here. But another word I've been thinking about is disgorgement. Is that what you're asking for, a disgorgement of funds that should not have been gathered? I think Raintree Homes, this court used that exact term, I believe. It's kind of a disgorgement. It's done to make sure that the defendants, here the state, doesn't profit off of its unconstitutional actions. And so that's the reason why it's done. As far as— And when we follow through this idea of disgorgement, disgorgement of what, funds held by the state? Well, it's disgorgement of my client's money, which is not state funds, and there's a distinction. But held by the state at this point? Well, there are possessors. It says a thief possesses money sometimes that has been taken unlawfully. Yes. The way I look at it is this. The state had no right to this money. The state can't keep this money. That's what the Tyler v. Henneman County states. That's what cases from this court state. They have taken the money illegally. It is not state funds because of the order of this court in 2021. Let me address that. This court in 2021 stated that— Counsel, before you address that, back to Justice Tice's question. How would this disgorgement take place? Where would it come from? What's the process for giving you the money back, giving your clients the money back? I believe there is power of the courts to make sure that the necessary constitutional remedy occurs. It can be this court's order informing that the plaintiff's own money needs to be returned to them. I think we're asking the same question. Who's going to cut the choke? The comptroller? Who is going to cut the check would be the state would cut the check. At some point in time, obviously the order would be against the clerks. The state would be indemnifying the clerks. The AG's office is here because they, at this point in time, have stated that they're being asked for indemnification. If I could, just to follow through with this idea, the money would come from the General Revenue Fund of the State of Illinois. The comptroller would issue a check. Some of that money may come from that source. There's also, of course, money sitting in bank accounts that Will County and Cook County has money in. I think, Justice Cunningham, you were talking about that at the very beginning, that there is, in fact, some money still sitting out there, $731,000, or maybe Justice Holder-White was talking about that, $731,000. But the way, and again, to address whether this is state money, I'm looking at it and I think from a standpoint of... How does the Court of Claims factor in? If this is money that's coming from the state, why isn't this a proper matter for the Court of Claims? Because the Court of Claims doesn't have jurisdiction here, Your Honor. The Court of Claims does not have jurisdiction over constitutional matters. This is still a constitutional... A constitutional... The Court of Claims isn't being asked to decide the constitutionality of this. The circuit court has already done that. The Court of Claims would be deciding how much money is due and the mechanism for refunding it. Isn't that what the Court of Claims would be charged with doing? This is still a part of judicial review until the necessary constitutional right is upheld. The courts are the exclusive branch of government that should be making these decisions, not outside of the judicial branch. So this is why the Court of Claims does not have jurisdiction, and also, again, humbly, this is not a sovereign immunity case because, again, these are not state funds. This court's decision in 2021 found that this was facially unconstitutional. Once a statute is considered facially unconstitutional, it is void of initio. That means it's as if it never existed. So the parties are... The necessary constitutional remedy is to put the parties back where they were prior to the time they had contact under this statute. The question is how does that get worked out? Who makes that decision? Is it a court or is it the Court of Claims? In other words, the constitutional issues and injunctive relief clearly fall within the court's general jurisdiction. But, again, that's not what you're asking for right now. You're asking for the return of money, discouragement, whatever we're going to use, that is in the general revenue fund. That's what you're asking for, right? You're not asking a finding of constitutionality. You're not unconstitutional. You're not asking for injunctive relief. You're asking for a check to be paid to your clients. But this check that's being paid, again, is not state funds in regard to what the court has already ruled. Once it is void of initio, it's as if it never existed. The state can't act as if it still exists. We're put back into the position, both the defendants and the plaintiffs are put back into the position they were prior to the time that they paid any money to the state. So once they're in that position, it's no longer state funds. That's the argument you make to the court of claims, correct? The funds that are being held by the state, in fact, must be returned because the statute under which they were collected is void. That's an argument to the court of claims. No one's saying you can't make that argument. Well, I still think, Your Honor, this is part of judicial review. It's meaningless to have judicial review by the courts if the courts aren't the ones that make the decision as to what is the necessary remedy for that constitutional violation. It's a constitutional taking. What you're trying to do is make a remedy for that constitutional taking. That's for the courts to do. That's a separation of powers issue if somebody else does it. Now, again, the reason why sovereign immunity does not apply is that sovereign immunity exists to protect the lawful actions of state officials for being controlled by a lawsuit. Here, there's no lawful right for the defendants to violate the Constitution by applying an unconstitutional statute. They don't get sovereign immunity for that particular act. Also, sovereign immunity is to protect the money of the state coffers. And we're merely asking for restitution. Again, different than past damages. That's the Rain Tree Homes decision of this particular court. It says that money is not considered damages for past action. That's considered restitution. It's just giving your money back. It's not the state's money because the state didn't lawfully have any right to that money. It can't be the state's money. So that's, again, the order of this court in 2021 when it said that the statute was unconstitutional. Void ab initio. It's not the state's money. The defendant's ultimate position in this case is easily determined. Having failed in their argument that the subject add-on court fees were constitutional, they now seek to delay and reverse the process providing the constitutional remedies of reimbursement of the plaintiff's own money so the state can keep the fruits of the unconstitutional taking. In fact, Defendant Chastain, on behalf of all circuit court clerk, argues on page 7 of the reply brief that the court finds there is no jurisdiction in the court system to ensure the Walker plaintiffs are provided their constitutional protections. It does not matter if the court claims it has no jurisdiction here in the Walker case. It is the defendant's position that the state can continue to retain the unlawful money taken from the Walker plaintiffs. And until that money is paid back, it continues to be an unconstitutional taking. Again, the Court of Claims has jurisdiction here in those cases which are set forth in the Court of Claims Act. The Court of Claims Act notes that jurisdiction has over claims against the state. The defendant clerk supplied unconstitutional statutes thereby depriving the Walker plaintiffs of their constitutional rights. As a matter of law, this case is not considered an action against the state. So therefore, the Court of Claims has no jurisdiction over this matter. The Court of Claims does not have jurisdiction here in the Walker case as the funds which were returned to the plaintiffs pursuant to a finding of facial unconstitutionality cannot lawfully be considered state funds. There being no state funds at issue, the Court of Claims lacks jurisdiction. And we were talking earlier about the amounts of money that are sitting in other funds. Moreover, the Court of Claims has no jurisdiction over the orders of the circuit court which segregated those funds in Walker. It required the defendants to segregate and hold funds on filing fees paid by the plaintiffs which were not in the possession of the state treasurer or the general revenue funds. While it's the plaintiff's firm belief that the Court of Claims has no jurisdiction or authority over any part of this constitutionally based case, it certainly does not have authority to modify or overrule a circuit court order which mandated that the defendants hold approximately three-quarters of a million dollars of the plaintiff's money paid pursuant to the facial gut constitutional statutes. That's money that is being segregated and held by both Willow County and Cook County at the present time under an order of the circuit court that still stands as of today. And that's a fraction. It is. Just a mere fraction. That's, again, but that's another reason why the Court of Claims can't have jurisdiction over this because they have no power then to change that court order and have power in the judiciary to say, okay, I'm going to change that court order. Finally, the Court of Claims has nothing to decide in the Walker case. A constitutional remedy of restitution was set in motion by this court's 2021 order. By the affirmance of the trial court's finding of facial unconstitutionality of the subject legislation and the Illinois courts are exclusively powered to determine and enforce the constitutional remedy of restitution. Otherwise, the branch of government which violated the plaintiff's constitutional rights, the legislative branch, would have a tribunal of the legislative branch deciding whether it will allow the plaintiff's unnecessary constitutional remedy, which, again, causes the separation of powers issue. The defendants cite the Farmer v. Madigan case and claim it's factually and legally like this case. It is not. First, the court in Farmer did not adjudicate any constitutional violation. In fact, the Farmer case holdings were on non-constitutional grounds. The Walker case, on the other hand, adjudicated a constitutional violation which necessitated that Illinois courts not only declare that the statute was facially unconstitutional, but be the branch of government which enforces the remedy of constitutional violation. Be the branch of government that returns the money to the defendants. Mr. Cray, and you may have stated this already, so if you have, I apologize, but these funds that are being held pursuant to a circuit court order are being held by what entity? Being held by which defendants? Well, who's holding the money? They were supposed to be in segregated bank accounts for Cook County and for Will County. This happened, Justice, through a request by the plaintiffs and an agreement by the defendants because there was an injunction enjoining this particular order, and the circuit court judge said, wait a second, what's happening with all this money that's sitting out there? It can't go to the state anymore. It's just sitting out there being held because you can't, I had an earlier order that said you can't send it in anymore because it's unconstitutional. And his order then was, okay, whoever's holding money, whatever courts is holding money, you must segregate it and hold it and not send it in to the state treasurer, which the statute mentions. It's being held in various bank accounts pursuant to a circuit court order of court. Yes. Under the authority of no one except the court's order. Only the court's order at this point in time. But, counsel, that's only a portion of the money, right? It is. I think Justice Rochford's question goes to where is, who is holding the rest of the money that's not in these segregated accounts? Well, the other money, 98% that's not in the segregated account went to the state treasurer. So the state treasurer is holding the rest of the money. Yes. And then 2% of the money was being kept by the clerks for the administrative fund. And that 2%, that's not part of the $750,000. It is not. That's a separate $2 million or thereabouts. And, again, a difference of Parmar to our case. Parmar asked for damages, interest. And, again, this is the city of Springfield versus Alton where in Alton 1, the court said, well, we're going to let you have restitution because we're going to allow you to make sure you get your money back that was paid in these improperly taken tax money. But in Alton 2, the circuit court had allowed interest. And Alton said, and the court, this court said, now you're talking about state money. Restitution, we can give you restitution, but we can't give you interest because now you're talking about the lawful general revenues. We can give you your money back, but we can't give you the interest. And that's exactly what we did here. We made sure we never asked for interest. In Parmar, they asked for interest. And Justice Tice mentioned in Parmar, you asked for something that was beyond what you could ask for under these particular statutes. And, Justice, you mentioned that you, meaning the Parmar plaintiff, you had your right statutorily to go into court and get your money under these tax statutes. We here don't have that right. We had to go in as we did under constitutional claims. So this case, our case, was very different than the statutory cause of action, which were available. And, Justice Tice, you mentioned that you had a right, sir, under the Parmar plaintiff, you had a right to go in and challenge that statute, the constitutionality of it, and you had a right, sir, to go in and get your relief under these particular statutes, which was the money you paid improperly to the state. You had that right. You didn't take it. And so, therefore, we don't allow you to go forward. Here, we never had that right. We had to go in. Please bring your remarks to a close. Okay. Thank you. Thank you. Again, the time for reply will be divided between the attorneys with the appellate. The State Lawsuit Immunity Act provides the state of Illinois shall not be a party or defendant in any court. There's one exception. Prospective relief exception. Relief going forward into the future. Counsel here was straining to not admit that the money that's going to have to pay for, I'm going to quote, violating his client's rights, which is what Walker was facially unconstitutional, that money's going to come from the general revenue fund from the state of Illinois. The check will be cut from the treasurer and countersigned by the comptroller. That's where the money is going to come from. This is a claim against the state of Illinois. We've heard a lot of discussion about the money that the clerks held, the $600,000, and it's court-ordered. I can tell you the money was brought up in trial court. There was some money that had been held back. And what the trial court essentially said is, look, just hold on to that. It is not in a court fund. The Protest Money Act procedures where it should be a segregated fund under the control of the courts with a trustee named by the courts watching that fund. None of that took place here. And any suggestion by the plaintiff that that took place is not accurate. In fact, it's in the record that the money that has been sent to the state treasurer has been spent. There is no money to recover in a fund somewhere sitting with the treasurer. The money has been spent. The best route, according to Parmar, is for the appellate court to be reversed, the trial court be affirmed, and the plaintiffs seek their relief in the court of claims, which after the claims are adjudicated and make sure that some of the people that have not already been refunded this money in the court of claims can do that, then the court of claims will enter a judgment that can be then appropriated by the state legislature. That's the process that is involved with the court of claims, which has the exclusive jurisdiction, contrary to what counsel for the plaintiff said, the exclusive jurisdiction in this case. All claims against the state of Illinois. This seems to me to be a constitutional tort case. This belongs in the court of claims so that it can be orderly refunded to the claimants. The legislature can appropriate the money in a fashion that will not impact state finances, which is why sovereign immunity is put in place in the first place. Well, opposing counsel says this is not even a sovereign immunity case. I mean, technically, the suit was not brought against the state. It was brought against the clerks. But your position is that the clerks are in the stead of their state officials and that they're in the stead of the state? Justice Holder-White, there is no dispute, and the plaintiff will agree with this and has already acknowledged that the state clerks are state officials. There is no distinction between the circuit court clerks, which are nonjudicial members of the judicial branch, and the state of Illinois. It is all the same thing. And frankly, the plaintiff is going to sit there and say, well, yeah, they're part of the state because he wants the money from the state. The problem with the appellate court's decision in this case, it also makes reference that the clerks were acting outside of their statutory duties in Illinois. There could be an argument that could be made if the clerks were so far out of bounds of their duty that this is not even an action against the state where the state would have to indemnify. I don't think the plaintiff wants to go there, and he certainly didn't make that argument in his briefs. The court of claims is where this case belongs. It has exclusive jurisdiction. I'd ask that you reverse the appellate court and affirm the trial court. Thank you. Thank you very much. You may please report. Your Honors, I have two quick points on rebuttal. Plaintiffs have raised Raintree Homes v. Village of Long Grove in support of their position. However, contrary to their argument, that case does not provide any support for their argument. Any distinction between restitution and damages that were addressed in Raintree are simply inapplicable to this case. In Raintree, the plaintiff could specifically seek restitution because it was under a different immunity statute, under the Local Government and Governmental Employees Tort Immunity Act, which provides specifically that the plaintiff could seek, and I quote, relief other than damages. So that distinction mattered for purposes of Raintree. That distinction does not matter here because there is no similar provision in the language of the Immunity Act. In addition, this court need not and should not address whether or not the court of claims has jurisdiction over a plaintiff's refund claim in answering the question before it today. The only question before this court today is whether or not Sovereign Immunity has stripped the Circuit Court of subject matter jurisdiction over the refund claim. And here that question is answered by the Immunity Act. And because plaintiff has sought a direct monetary payment from the state, it does not qualify for the officer's suit exception, and therefore Sovereign Immunity bars plaintiff's refund claim. And I think it's also important to note that this court in Parmar has already rejected explicitly the same argument that plaintiffs are attempting to raise here today, that unless their refund request is allowed to proceed in the Circuit Court, that they will be without a venue to seek relief. In specifically rejecting that argument, this court explains that the Illinois Constitution does not require a certain remedy to be provided in any specific form, and that limiting a plaintiff's available remedies does not run afoul of the Constitution. This court should therefore simply follow in Parmar's footsteps and reject the notion that the refund claim should be allowed to proceed in the Circuit Court merely because of the possibility that the Court of Claims may or may not have jurisdiction over the matter. If there are no further questions, defendants' opponents, the 18 clerks, request that you reverse the decision of the Appellate Court and affirm the judgment of the Circuit Court and find that Sovereign Immunity bars plaintiff's refund claim. Thank you. Thank you very much. This case, Defendant Number 6, Number 130288, Arundhati Walker v. Andrea Lee Chastain, etc., will be taken under advisement. Thank you both, all, for your arguments today.